IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **: Civil No. 1:14-CV-01474** |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **COMMONWEALTH OF** | : |
| **PENNSYLVANIA and** | : |
| **PENNSYLVANIA STATE POLICE,** | : |
| | : |
| **Defendants.** | **: Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

Before the court is the parties' joint motion for entry of final settlement agreement. (Doc. 200.) For the reasons discussed below, the motion will be granted.

## I.   BACKGROUND

In June 2014, the United States commenced this action against the Pennsylvania State Police ("PSP"). (Doc. 1.) The complaint alleges that PSP have violated Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") by engaging in a pattern or practice of employment discrimination in connection with hiring entry-level state troopers.

Beginning in 2003, PSP employed two "physical readiness tests" for hiring new troopers, the 2003 Readiness Test and the 2009 Readiness Test. The tests involved a 300-meter run, a 1.5-mile run, push-ups, and a vertical jump. (*See* Doc.

129, pp. 5–6.) The 2003 Readiness Test also included sit-ups, and the 2009 Readiness Test an agility run. Cutoff scores existed for each event, and applicants who failed the tests were ineligible for hire. (*Id*.) The United States alleges that PSP's use of Readiness Tests to screen and select applicants for entry-level PSP trooper positions has an unlawful disparate impact against female applicants, who have passed the physical fitness tests—and thus been hired—at significantly lower rates than male applicants, and that alternative tests exist that would satisfy PSP's law enforcement needs while having less of a disparate impact. (*See* Doc. 1, ¶¶ 20–21, 23, 25, 27(b).)

On November 10, 2014, Defendants filed a motion to dismiss, primarily arguing that Title VII's Section 707(a), pursuant to which the United States filed this action, only confers authority upon the United States to bring claims for disparate treatment, and therefore, the court lacks subject matter jurisdiction over Plaintiff's claim for disparate impact. (Doc. 26.) The court denied the motion in a memorandum and order on May 21, 2015. (Docs. 45–46); *United States v. Pennsylvania*, 110 F. Supp. 3d 544 (M.D. Pa. 2015). Defendants subsequently answered the complaint. (Doc. 52.)

In August 2016, following a voluminous discovery period, the United States moved for partial summary judgment and PSP cross-moved for summary judgment. The United States moved for partial summary judgment on the first prong of the

Title VII burden-shifting framework, arguing there was no genuine dispute that women pass the Readiness Tests at statistically significantly lower rates than men. (Docs. 79–82.) Defendants cross-moved for summary judgment and argued that disparate impact claims are not cognizable under 42 U.S.C. § 2000e-6(a)6 pursuant to *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc*., 135 S. Ct. 2507 (2015), and that the United States failed to establish the last element of its burden by suggesting the adoption of gender-based fitness tests as an alternative selection device to the Readiness Tests. (Docs. 83–85.)

In December 2017, the court granted the United States' motion and denied Defendants' motion and held that the United States demonstrated the first prong of the three-prong disparate impact analysis by proffering statistical evidence showing that the Readiness Tests disproportionately excluded women because of their gender. The court found that the evidence showed that between 2003 and 2009, 55% of women passed the 2003 Readiness Test as compared to 88% of males; and that between 2009 and 2015, 73% of females passed the 2009 Readiness Test as compared to 98% of males. (Doc. 129, pp. 20–21.) The court concluded that the disparity in passage rates was statistically significant at greater than seven units of standard deviation, and that but for the disparate impact, 151.8 additional females would have passed the 2003 Readiness Test and 121 females would have passed the 2009 Readiness Test. (*Id.* p. 20.)

In denying Defendants' motion for summary judgment, the court found that *Inclusive Communities* was not supervening law that warranted revisiting its prior order denying Defendants' motion to dismiss. (*See id.* p. 15.) It also declined to address Defendant's argument that the United States failed to satisfy the third prong of the disparate impact analysis since Defendant had not yet met its burdens of production and persuasion with respect to job relatedness. (*See id.* p. 31.)

In April 2021, the parties filed a joint motion informing the court that they reached an agreement to resolve all outstanding legal and factual disputes and requesting that the court provisionally enter the settlement agreement and schedule a fairness hearing. (Doc. 185.) The agreement provides that PSP will select entry-level troopers using the gender-and-age-normed Cooper Fitness Test and not the 2003 or 2009 Readiness Tests. (*See* Doc. 186-1 ¶¶ 24, 26–28.) The agreement further requires PSP to ensure that the Cooper Test imposes an equal burden of compliance on men and women, and it compels PSP to provide the United States with 60-days-notice of any proposed changes to the test. (*See id.* ¶ 27.) In addition, the agreement provides for individual monetary relief, priority hiring relief, delayed hiring relief, and non-competitive retroactive seniority relief for priority hires and delayed hires. It requires Defendants to establish a fund for eligible claimants in the amount of $2.2 million—comprising more than $1.8 million in back pay relief and an employment payment in lieu of retroactive pension benefits of no more than $375,000—and to

provide priority hiring relief for up to 65 qualified females who failed one of the Readiness Tests. (*See id.* ¶¶ 35, 40, 46.) A claimant need not express an interest in, or be eligible for, priority hiring relief, or accept an offer of employment in the trooper position to qualify for back pay relief. (*See id.* ¶¶ 10, 40.) A claimant who receives priority hiring relief, or who is a delay hire, will be eligible to receive non-competitive retroactive seniority, such as compensation rate and leave benefits, in accordance with their presumptive hire date, as well as an employment payment of $5,000 in lieu of retroactive pension benefits. (*See id*. ¶¶ 38–39, 46.)

After the court granted the parties' motion and scheduled a fairness hearing, the parties and claims administrator sent notice of the settlement agreement and fairness hearing and instructions for making objections to all identifiable class members, all incumbent PSP troopers, and the Pennsylvania State Troopers Association. (See Doc. 186-1 ¶¶ 73–74; Doc. 201-1, ¶¶ 4–8.) Additional notices of the agreement and hearing were posted in various publications and the websites of state and federal government agencies. (*See infra*, § IIIc.) The court subsequently received written objections to the settlement agreement from approximately 102 unique individuals. (*See* Docs. 201-2, 201-3, 201-4, 208-2, 209-2.) On August 5, 2021, a fairness hearing was held by web-conference and telephone in which the court heard objections from six individuals.

The parties now jointly move for final entry of the settlement agreement. (Doc. 200.) The motion is ripe for review.

## II.   **STANDARD OF REVIEW**

"In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). To approve a proposed settlement agreement, the court must find that agreement is fair, adequate, reasonable, and consistent with the law. *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983). This requires the court to weigh the parties' chances of success on the merits against the relief offered in the settlement. *Id.* An initial presumption of fairness arises where the negotiations occurred at arms-length, there was sufficient discovery, the proponents of the settlement are experienced in similar litigation, and only a small fraction of the class objected. *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516, 535 (3d Cir. 2004). Other considerations include the absence of collusion in the settlement, the complexity and expense and likely duration of the litigation, the extent of discovery that has occurred, and the experience of counsel who negotiated the settlement for plaintiffs. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993); *United States v. New Jersey*, No. 87-CV-2331, 1995 WL 1943013, at *11 (D.N.J. Mar. 14, 1995); *Williams v. Vukovich*, 720 F.2d 909, 921–23 (6th Cir. 1983). Consistency with the law, in the

context of a proposed settlement, means that the agreement must not be unconstitutional, unlawful, or contrary to public policy. *See United States v. New Jersey*, No. 10-CV-91, 2012 WL 3265905, at *7 (D.N.J. June 12, 2012) (quoting *United States v. City of Miami*, 614 F.2d 1322, 1333 (5th Cir. 1980)).

## III.   DISCUSSION

### a.   The settlement agreement is fair, reasonable, adequate, and consistent with the law.

As an initial matter, the United States has a strong case on the merits of its claim that PSP violated Title VII by engaging in a pattern or practice of employment discrimination in connection with hiring entry-level state troopers through use of the 2003 and 2009 Readiness Tests. Title VII endeavors to ensure that workplaces are free of discrimination and that employment decisions are made based on qualifications rather than on extraneous factors such as race or gender. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011) (citing *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009)). Title VII prohibits both intentional discrimination and, in some cases, practices that are not intended to discriminate but that have a disproportionately adverse effect on minorities, known as disparate impact discrimination. *Ricci*, 557 U.S. at 577.

Under the statute, to prevail on a disparate impact claim, the plaintiff must "demonstrate[ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42

U.S.C. § 2000-e2(k)(1)(A)(i). The employer may then defend against the plaintiff's prima facie showing of disparate impact only by demonstrating that the practice is "job related for the position in question and consistent with business necessity." *Id.* The Third Circuit has interpreted this to mean "that employers may not use criteria which have a discriminatory effect unless those criteria define the minimum qualifications necessary to perform the job." *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 477 (citing *Lanning v. Se. PA. Transp. Auth.*, 181 F.3d 478, 489 (3d Cir. 1999)) ("[I]n order to show the business necessity of a discriminatory cutoff score an employer must demonstrate that its cutoff measures the minimum qualifications necessary for successful performance of the job in question."). Even if the employer meets that burden, however, the plaintiff may still succeed "by showing that alternative practices would have less discriminatory effects while ensuring that candidates are duly qualified." *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 477 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii),(C)).

Here, the United States has a strong case on the merits of its claim for disparate impact because, as the court found in its summary judgment memorandum, the United States established the first element of a disparate impact claim by demonstrating a significant disparity between male and female pass rates. In its summary judgment ruling, the court found that between 2003 and 2009, 55% of women passed the 2003 Readiness Test compared to 88% of males, and that between

2009 and 2015, 73% of females passed the 2009 Readiness Test compared to 98% of males, and that disparity in the passage rates was statistically significant at greater than seven units of standard deviation. (*Id.* pp. 20–21.)

In addition to its success on the first prong of its claim, the United States represents that it was prepared to show at trial that the Readiness Tests were not supported by business necessity and that alternative tests existed that would effectively screen applicants while having less of a discriminatory effect. The record contains at least some support for the later contention, as the parties' submissions show that gender-neutral fitness tests have become increasingly adopted by law enforcement agencies around the country and that the Cooper Fitness Test will allow PSP to adequately screen candidates for entry into its academy. (*See* Doc. 201, pp. 22–23.) Moreover, while PSP's voluntary adoption of the Cooper Fitness Test may not have been admissible at trial, its considered judgment that the examination is an adequate screening device gives at least some credence to the United States' assertions that it was prepared to demonstrate as much before a jury. It thus appears that the United States would be likely to succeed on the merits of its Title VII claim were this case to proceed to trial.

Given the United States' strong case on the merits, the court finds the substance of the settlement agreement is fair, adequate, and consistent with the law. The parties' agreement that, going forward, PSP will use the Cooper Fitness Test

and not the 2003 or 2009 Readiness Tests is reasonable and fair considering the United States' likelihood of success on the merits, and in particular the court's finding on summary judgment that the Readiness Tests had a disparate impact on female troopers. The parties have shown that the Cooper Fitness Test will be administered to ensure an equal burden of compliance on men and women and avoid the gender disparities that resulted from the Readiness Tests and form the basis of this action. (*See* Doc. 186-1, ¶ 26.) *See Bauer v. Lynch*, 812 F.3d 340, 351(4th Cir. 2016). Its adoption will not undermine public safety or cause unready troopers to be hired because, as the parties recognize, the Cooper Fitness Test and other gender-neutral fitness examinations are successfully utilized by at least 20 state police departments and are quickly becoming the norm among law enforcement agencies throughout the country. PSP itself also voluntarily adopted the Cooper Fitness Test such that 786 active sworn PSP members were hired during its administration, and importantly, the examination is used only to screen for entry into PSP's training academy, which itself consists of rigorous and progressive physical training and is designed to provide all candidates with the physical skills needed for the job. (*See* Doc. 201, p. 22.) The injunctive relief in the settlement agreement thus furthers the public interest by ensuring that female candidates are not unfairly screened from the candidate pool while upholding public safety and the professionalism of PSP.

So too is the individual monetary and injunctive relief in the agreement fair, adequate, and reasonable. The establishment of a substantial $1,825,000 fund for back pay will provide meaningful and direct relief for many claimants and appropriately reflects the United States likelihood of prevailing at trial. The parties have demonstrated that the fund is sufficient to redress the claimants' injuries but will not result in a windfall to any class members, and while claimants will not be eligible to receive the full compensation they would have earned but for the alleged discriminatory conduct, the amount of individual relief represents a practical compromise given the risks of litigating this case to verdict. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975) ("[B]ack pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.").

Further, the retroactive seniority relief in the agreement will help to ensure that class members receive the seniority they would have earned had they not been screened out of the hiring process as a result of the examinations. Retroactive seniority is a central component of make-whole relief, and without it, victims of discrimination would perpetually remain subordinate to employees who would, but for the discrimination, be their inferiors. *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 767–68 nn.28, 41 (1976) (noting that retroactive seniority "cuts to the very

heart of Title VII's primary objective of eradicating present and future discrimination in a way that backpay, for example, can never do" and instructing that "district courts should take as their starting point the presumption in favor of rightful-place seniority relief"). The retroactive seniority relief in the agreement is limited to non-competitive seniority rights such as salary and leave benefits and therefore will not have any material effect on incumbent troopers or lead to premature promotions in rank. (*See* Doc. 186-1, ¶ 38.) Despite the strength of the United States' substantive case, the omission of competitive retroactive seniority relief is proper considering PSP's unique public safety responsibilities, and the exclusion of retirement benefits in lieu of a one-time employment payment is a practical limitation and suitable compromise considering the uncertainties of trial. (*See id*. ¶ 46.)

The priority and delayed hiring relief established in the agreement is also appropriate and will provide a direct remedy those who were disqualified from entering PSP's academy as a result of the disparate impact of the Readiness Tests. The "central purpose of Title VII is to provide make-whole relief for victims of unlawful discrimination," and hiring relief achieves this most directly by helping to eliminate the effects of discrimination in the workforce and by placing claimants in the same position they would have been but for the discrimination. *See Kunda v. Muhlenberg College*, 621 F.2d 532, 549 (3d Cir. 1980) (noting the district court's

broad equitable discretion to award hiring relief). Priority hiring relief for up to 65 individuals represents almost a quarter of the females who were disparately impacted by the examinations—and ostensibly a significantly larger portion of those disparate impact victims who remain qualified and interested in joining PSP all these years later—and marks a substantial and well-justified recovery for the class given the strength of its case. Importantly, the relief is narrowly tailored and limited to class members who meet the minimum qualifications for hire and who were screened out of the hiring process because of the Readiness Tests. (*See* Doc. 185, ¶¶ 30–36.) The agreement is careful to avoid harm to third-parties and establishes an appropriate cap for the number of priority hires that may enter any single academy class, and there is no reason to believe the relief will lead to the elimination of any incumbent trooper position. (*See id.* ¶ 36.)

Additionally, the extent of completed discovery, the stage of proceedings, the absence of collusion, and the participation of experienced government counsel provide further support for approving the agreement. The agreement is the product of seven years of litigation and arms-length negotiations between state and federal government agencies. It was negotiated by the parties after they received substantial fact and expert discovery, and following the court's grant of partial summary judgment to the United States on the issue of disparate impact. The parties are represented by government counsel with significant experience in Title VII

investigations and litigation, and there is no suggestion in the record of any collusion or other procedural impropriety. These procedural considerations weigh in favor of a finding that the agreement is fair, adequate, and reasonable. *See City of Miami*, 614 F.2d at 1332 n.18 (government participation); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537 (stage of proceedings and adequate notice of merits when negotiating); *E.E.O.C. v. Com. of Pa.*, 772 F. Supp. 217, 220 (M.D. Pa. 1991) (length of negotiations and absence of collusion).

In sum, the substantial recovery by class members accurately reflects the United States' chances of success at trial. The parties' have shown that the settlement agreement will further the public interest by ensuring PSP's continued use of gender-neutral standards, and that it will provide effective relief to class members while minimizing potential harm to third-parties and the public at large. The merits of the case, the effectiveness of the relief, the lack of harm to public safety, PSP's voluntary adoption of a portion of the relief, and the procedures by which the agreement was executed thus weigh in favor of a finding that the agreement is fair, adequate, and consistent with the law.

### b. The objections raised in opposition to the settlement agreement are without merit.

While the court received written objections to the settlement agreement from 102 individuals, many of whom objected to the settlement agreement on multiple

different bases, none of the objectors raise meritorious arguments that would warrant modifying or withholding approval of the agreement as written.

For example, one category of objections contends generally that a gender-neutral physical test will be ineffective in screening or preparing candidates for employment as a trooper. Specifically, approximately 90 individuals assert that adopting the Cooper Fitness test will improperly lower the standard for trooper applicants, lead to less physically-ready troopers, and/or have a harmful effect on public safety. While these arguments have some intuitive appeal, they are not borne out by the record. As discussed above, the parties have demonstrated that the Cooper Fitness Test will not only place an equal burden of compliance on men and women, but also that it will provide an effective screening device for entry into PSP's academy. The record shows that similar examinations have been adopted by law enforcement agencies around the country and that PSP itself has voluntarily administrated the Cooper Fitness Test for several years. Despite such widespread use of the Cooper Fitness Test and similar examinations, none of the objectors cite any specific facts or authority to support their core contention that the tests are not effective measures for screening candidates for employment as a law enforcement officer. Several of the objectors also appear to overlook that the test will be employed only as an initial screening device rather than to prepare individuals for the physical requirements of being a trooper. All candidates who pass the Cooper Fitness Test

and otherwise meet the requirements for a trooper must still complete PSP's training academy and undergo rigorous physical training designed to provide individuals with the physical skills needed for the job. The record thus does not support the objectors' generalized concerns that the administration of the Cooper Fitness Test will undermine trooper readiness and threaten public safety. As such, the objections will be overruled.

A second category of objectors comprising approximately 72 individuals contends that the Readiness Tests were not discriminatory because they held male and female applicants to the same standard. These arguments are unpersuasive, and even irrelevant, because this action has nothing to do with intentional discrimination. The basis of the United States' claims is instead that PSP's administration of the Readiness Tests, which were indisputably facially neutral, resulted in a disparate impact upon female applicants and unjustifiably prevented them from obtaining equal employment opportunities with PSP. Its allegations enjoy strong support in the court's memorandum granting the United States partial summary judgment, which found that the disparity in passage rates between males and females was greater than seven standards of deviation notwithstanding the facial neutrality of the examinations. It is well-established that where an employment practice is shown to have such a disparate impact, Title VII may attach "without proof that the employer adopted these practices with a discriminatory motive." *MacNamara v. Korean Air*

*Lines*, 863 F.2d 1135, 1148 (3d Cir. 1988) (citing *Watson v. Fort Worth Bank & Trus*t, 487 U.S. 977, 108 S. Ct. 2777, 101 L.Ed.2d 827 (1988)). The facial neutrality of the Readiness Tests and PSP's lack of discriminatory intent therefore have no bearing on the substance of the United States' underlying Title VII claim, and the objections will be overruled.

A third category of objections takes issue with the back pay relief established in the agreement. Approximately 29 objectors contend that providing back pay to claimants who did not pass one of the Readiness Tests will unfairly reward failure and provide them a windfall by compensating them for work that was never actually completed. These objections are not persuasive because the bone they pick is with the general concept of back pay rather than the unique terms of the settlement agreement. As discussed above, back pay is a well-recognized form of relief under Title VII that generally may be denied only for reasons that would frustrate Title VII's central purpose of eradicating discriminating and making victims whole. *See Albemarle Paper Co*., 422 U.S. at 421. The court has concluded that the amount of back pay in the agreement is fair, reasonable, and adequate given the record and particular facts of this case, and none of the objectors make any persuasive argument to the contrary. This category of objections will therefore be overruled. *See United States v. City of Warren, Mich.*, 138 F.3d 1083, 1097 (6th Cir. 1998) ("Because lost overtime is a well-established part of a back pay award under Title VII, the district

court's reasoning that including overtime in [the claimant's] award would be a "windfall" is inconsistent with that court's finding that [the defendant] would have hired [the claimant] but for discrimination. The district court's exclusion of back pay from [the claimant's] award does not place him as near as possible to the position he would have occupied absent discrimination. Therefore, the district court did not apply the law properly, and we find that it abused its discretion with regard to this issue.").

A fourth category of objectors challenges the fairness of providing retroactive seniority relief to class members. Approximately 22 objectors contend that providing retroactive seniority to class members will be generally unfair to incumbent troopers and may even create divisions among PSP's ranks. Retroactive seniority is a central component of make-whole relief, however, and the law is clear that it may not be denied "on the abstract basis of adverse impact upon interests of other employees." *Franks,* 424 U.S. 747, 779 n.41. Like those individuals who challenge the back pay relief, the objectors to retroactive seniority do not raise any specific issue that might arise from a particular provision of the settlement agreement, and the generalized concerns they do raise appear to be unfounded. The settlement agreement provides only for non-competitive retroactive seniority such as compensation and leave benefits, and there is no reason to believe that relief will have any material effect on incumbent troopers. As outlined above, retroactive seniority is proper in this case to

provide claimants with some measure of the seniority they would have enjoyed but for the disparate impact of the Readiness Tests. The objectors' sweeping challenges to retroactive seniority based on potential unhappiness by current employees are not a basis for denying relief. Accordingly, these objections will be overruled.

Finally, approximately 27 objectors argue that the tests should not be changed because they were helpful in preparing for the job. One of the objectors, a PSP trooper with experience training new recruits, spoke at the fairness hearing and contended that it was her experience that the Readiness Tests were effective tools for screening candidates. While some of these objectors cite anecdotal experiences supporting their belief that the Readiness Tests were an effective means for screening candidates, their arguments do not adequately address whether an alternative test exists that would also sufficiently prepare individuals for the job as a trooper. Under Title VII, where a defendant shows that a challenged employment practice is supported by business necessity, the plaintiff may nevertheless prevail by demonstrating that an effective alternative practice exists that would have less discriminatory effect. *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 477. As discussed above, the United States has a strong case that such a test does exist in the form of the gender-neutral Cooper Fitness Test, which PSP has voluntarily adopted and successfully utilized for several years now. None of the objectors raise substantive concerns regarding the effectiveness of the examination, and as such, there is no

reason to withhold approval of the agreement as it relates to PSP's adoption of the Cooper Fitness Test.

In sum, none of the arguments raised by objectors calls into question the fairness, adequacy, reasonableness, or lawfulness of the settlement agreement as written by the parties, and there is no basis for rejecting or otherwise modifying its terms.

### c. **The parties' notice procedures were reasonably calculated to provide all interested parties with notice of the action and an opportunity to present objections to the settlement agreement.**

Finally, the court finds that the parties satisfied due process by making actual notice and constructive notice that was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see* 42 U.S.C. § 2000e-2(n).

Beginning in April 2021, the parties and claims administrator sent notice of the settlement agreement and fairness hearing and instructions for making objections to all identifiable class members, all incumbent troopers, and the Pennsylvania State Troopers Association. (*See* Doc. 186-1, ¶¶ 73–74; Doc. 201-1, ¶¶ 4–8.) The parties located the contact information for all class members and sent notice documents to all identifiable email and physical addresses. (Doc. 186-1, ¶ 74(b); Doc. 201-1, ¶ 9.) Notice of the agreement and hearing was also published in the *Philadelphia Inquirer*,

the *Pittsburgh Post-Gazette*, and on public websites for the Department of Justice, PSP, and the Commonwealth of Pennsylvania (*see* Doc. 186-1, app. C); and the claims administrator established an email address, toll-free telephone number, and website providing interested individuals with information about the agreement and instructions for making objections (*see* Doc. 201-1, ¶ 10–11). The notices were effective, and the court received over 100 written objections from the public. A fairness hearing was held via web-conference and telephone in which the court heard objections from six individuals. Everyone who sought to be heard at the hearing received an opportunity to express their views.

The parties agree, and the court concurs, that these notice procedures, as outlined more fully in the Settlement Agreement, were sufficient to satisfy due process and protect the agreement from collateral attack. The parties worked diligently with the claims administrator to provide comprehensive notice to all interested parties, and their efforts were by all accounts successful. The court thus finds that the notice procedures undertaken by the parties were reasonably calculated to provide all interested parties with notice of the action and an opportunity to present objections. The parties have therefore satisfied due process, and the settlement agreement will be approved.

## IV.    **<u>CONCLUSION</u>**

For the reasons discussed above, the parties' joint motion for entry of settlement agreement will be granted. (Doc. 200.) An appropriate order shall follow.

Dated: December 31, 2021

<u>*/s/ Sylvia H. Rambo*</u>
Sylvia H. Rambo
United States District Judge
